fendant at trial, the court will rule upon the admissibility of the evidence in question.

This case is scheduled for trial as the No. 2 case for Tuesday, December 8, 1987.

**W & G SEAFORD ASSOCIATES, L.P.,**
**a Delaware limited partnership,**
**Plaintiff,**

**v.**

**EASTERN SHORE MARKETS,**
**INC., Defendant.**

**Civ. A. No. 88–232–CMW.**

United States District Court,
D. Delaware.

June 9, 1989.

Edward M. McNally (argued), Kathleen A. Morris of Morris, James, Hitchens & Williams, Wilmington, Del., for plaintiff.

Carl Schnee (argued), Kevin G. Healy of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This is a contract action in which plaintiff, W & G Seaford Associates, L.P. ("W & G"), seeks to enforce a liquidated damages clause in a commercial lease entered into with defendant, Eastern Shore Markets, Inc. ("ESMI"). W & G, a Delaware limited partnership, is the owner of Seaford Village Shopping Center ("Seaford Village"), a strip shopping center in Seaford, Delaware. ESMI, a Virginia corporation, signed a lease under which it was to occupy a large retail area in Seaford Village. Before occupying the space, ESMI cancelled its plans to operate a food market in Seaford Village and repudiated the lease.

W & G filed suit on May 5, 1988. ESMI answered and counterclaimed for the rent deposit it had tendered to W & G under the lease. Presently before the Court are four motions. On January 17, 1989, ESMI filed a motion for summary judgment. It argues, in sum, that no contract ever existed because of the non-occurrence of certain conditions precedent, and that, if a contract did exist, the liquidated damages provision in the lease is void as a penalty.

Three days later, W & G filed a motion for partial summary judgment in which it seeks to strike ESMI's defense that the liquidated damages clause is not valid or enforceable.[1] In response to W & G's motion, ESMI moved to strike an affidavit submitted by W & G in support of W & G's motion. Also in connection with the disputed affidavit, ESMI filed a motion for relief under Fed.R.Civ.P. 56(f).

This Court has jurisdiction pursuant to 28 U.S.C. § 1332. This Opinion will constitute the Court's consolidated decision on all four pending motions. For the reasons stated herein, the Court will grant W & G's motion for partial summary judgment and deny ESMI's motion for summary judgment. Also, the Court will grant ESMI's request to strike the disputed affidavit, but will deny ESMI's request for relief under Rule 56(f).

## I. FACTS [2]

Seaford Village is a strip shopping center having a total retail area of 185,000 square feet. There are three areas designated for larger retailers: (1) Legget, a department store, occupies 30,627 square feet; (2) Roses, also a department store, occupies 45,-

---

1. ESMI's "Fifth Affirmative Defense" provides: "Plaintiff's claim for liquidated damages is barred since the provisions of paragraph 34C. of the lease constitute an unenforceable penalty." Answer at ¶ 16.

2. Most of the salient facts in this case are not in dispute and are contained in a stipulation executed by the parties on January 13, 1989.

495 square feet; and (3) Safeway Stores, Inc. ("Safeway") leased an area of 40,998 square feet located in the center of Seaford Village for use as a supermarket.

Safeway entered into its lease agreement with W & G to occupy the 40,998–square–foot area ("Safeway store") on July 31, 1984. The lease term was twenty years, beginning September 1, 1985, and running through August 31, 2005. The parties agreed to a rent of $6.50 per square foot and a percentage rent, beginning in the eleventh year of the original term, of one-half of one percent (0.50%) of gross sales in excess of $14 million.

Safeway ceased operations in the Seaford store on February 22, 1987, but continued paying W & G square-footage rent. Effective October 1, 1988, Safeway will no longer be paying any rent to W & G, pursuant to an Agreement for Termination and Release of Lease executed between W & G and Safeway. Under this agreement, the parties mutually agreed to terminate the lease and liquidate Safeway's unfulfilled obligations by the lump-sum payment by Safeway to W & G of $450,000.

In July of 1987, W & G, through Richard Sullivan, then vice-president of the eastern region of Brown Properties, Inc. and property manager of Seaford Village, contacted ESMI about the possibility of leasing the vacant Safeway premises at Seaford Village. On August 5, 1987, David Green of B. Green & Co., a prospective tenant for the vacant Safeway store, informed Sullivan that B. Green & Co. decided against leasing the Safeway store because the Seaford market was not as strong as other nearby markets such as Dover, and the location would produce only marginal sales in view of the proposed Food Lion supermarket to be built across the highway from Seaford Village.

Negotiations between ESMI and W & G regarding the possibility of ESMI's leasing the vacant Safeway store commenced in August of 1987. On September 23, 1987, Joseph P. Ritorto, president of W & G, participated in a conference call with Edward L. Beyer and Lawrence J. Longua of Bankers Trust Company, W & G's bank, regarding the vacant Safeway store. The bank officers instructed Ritorto that in no event should he lose ESMI as a prospective tenant for the Safeway space. They emphasized to Ritorto the importance of placing a food store at Seaford Village, given the turndowns from other potential tenants in the market and the lack of depth of the food retail market in Seaford, especially in light of the announced opening of a Food Lion supermarket across the street from Seaford Village.

Negotiations between Ritorto, on behalf of W & G, and Nick Styke, president of ESMI, continued through the fall of 1987. On December 3, 1987, Styke signed a ten-year lease with W & G for the Safeway space. By cover letter on the same date, Styke instructed that the lease was not to be "effective" until ESMI received the following: (1) an agreement from Safeway that the other Safeway store in Seaford, Safeway Store # 1405, would not be leased to a competing supermarket for a period of five years; (2) approval in writing from Safeway or the landlord that all existing equipment that was inventoried would remain on the property for an agreed cash price of $500,000; and (3) legal bill of sale for the equipment purchased. Styke also stated in the letter that "[w]e have signed the proposed lease and are returning two copies for signatures by the landlord."

By its own terms, the lease was made expressly contingent on the unconditional termination of the existing Safeway lease in a manner acceptable to W & G.[3] As to the no-compete agreement referenced in Styke's letter, Safeway signed a no-compete agreement. A copy of the agreement was hand-delivered to Martin Atkins, vice president of ESMI, prior to the closing scheduled for January 5, 1988, between W & G and ESMI. Copies of the no-compete agreement, the agreement by Safeway to sell ESMI its existing equipment and the accompanying bill of sale were apparently

---

**3.** The lease between Safeway and W & G was terminated on October 1, 1988. For a more complete discussion of this condition, see *infra* at 1339–42.

available at the first scheduled closing.[4] That closing was postponed at ESMI's request.

A lease amendment, dated January 15, 1988, was executed on February 3, 1988. The amendment gave ESMI's bank, Mercantile Safe Deposit and Trust Company ("Mercantile"), a first-lien position on the Safeway equipment to be purchased by ESMI. In addition, the amendment reduced the square-footage rent and changed the percentage-rent figures. The amendment further stated that "the Lease is hereby ratified and confirmed in all respects and shall be binding upon the parties hereto and their respective successors and assigns." Also on February 3, 1988, ESMI mailed to Sullivan, the property manager, a check in the amount of $16,570.84, payable to W & G. The check stub contained the following notation: "(first month's rent)".

At the request of ESMI, the closing was rescheduled for February 11, 1988. At the closing, ESMI was to receive the Safeway no-compete agreement, ESMI was to pay $500,000 for the fixtures in exchange for a bill of sale and there was to be in effect a lease cancellation agreement between W & G and Safeway. The February 11, 1988, closing was not held.

On February 15, 1988, Styke wrote to Ritorto and stated that ESMI was not willing to proceed with the development of the Safeway premises. Styke explained that, "[w]ith the new competition coming to Seaford to compete for the same food dollars, the sales and profit potential will be unsatisfactory." As a result, he stated that ESMI had "lost interest and wish[ed] to cancel all plans for Seaford now permanently." At the time, the Safeway lease was still in force and had not been terminated.

4. *See* Affidavit of Richard J.F. Sullivan, attached as Exhibit B to W & G's Opening Brief on its motion. Despite this affidavit, there remain issues of fact as to whether the conditions would have been fulfilled but for ESMI's repudiation.

5. This is a diversity action, and therefore the choice of law rules and substantive law of contracts will depend on state law. *Coca-Cola Bottling of Elizabethtown v. Coca-Cola Co.*, 668

## II. ANALYSIS[5]

### A. *Existence of Contract*

ESMI first argues that no contract ever existed between it and W & G, or alternatively that its duties under any existing contract never became activated, because several conditions precedent were never fulfilled. As the party moving for summary judgment on this issue, ESMI must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Wilmington Housing Auth. v. Pan Builders, Inc.*, 665 F.Supp. 351, 353 (D.Del. 1987). The Court must view all the facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment. *Id.*

When parties disagree as to the existence of a contract and the evidence introduced is conflicting, but there is evidence from which a contract may be inferred, the jury, rather than the court, should determine the fact of the existence of the contract. 75 Am.Jur.2d *Trial* § 397 (1974). Similarly, the determination of the intent of parties to make a contract, as gathered from what they did and said, is normally a question of fact for the jury. *Id.* at §§ 401, 407.

However, the construction of the terms of a written agreement is a task for the court and not the jury. *Id.* at § 411; *Klair v. Reese*, 531 A.2d 219, 222 (Del.1987) (interpretation of contractual language, while analytically question of fact, is treated as question of law for court). Whether a provision in a contract constitutes a condition precedent depends on the intention of the parties. In ascertaining these intentions, a court must first look to the language of the contract, as well as the circumstances sur-

F.Supp. 906, 918 (D.Del.1987). Delaware's choice of law standard applies the principle stated in Restatement (Second) of Conflicts of Law § 188 (1971), that the law of the state with the most significant relationship to the transaction governs. 668 F.Supp. at 918. Here, the parties do not dispute that Delaware law applies.

rounding its execution. *Id.* at 223; *Marker v. United States,* 646 F.Supp. 433, 436 (D.Del.1986) (applying general contract principles).

■ The first of the alleged conditions is contained at paragraph 57 of the lease. Defendant's Appendix at 86 (hereinafter "DA–___"). That provision acknowledges the existing lease between W & G and Safeway, and states that the W & G–ESMI lease "is contingent upon the unconditional termination of the Existing Tenant's [Safeway's] Lease in a manner acceptable to Landlord [W & G]." DA–86. ESMI asserts that no such termination of the Safeway lease was ever tendered and that Safeway continued to pay rent through October 1, 1988.

The rights and remedies of landlord and tenant[6] are governed by contract law principles. *Brown v. Robyn Realty Co.,* 367 A.2d 183, 189 (Del.Super.Ct.1976). A condition precedent is an act or event, other than a lapse of time, that must occur before a duty to perform a promised performance arises. J. Calamari & J. Perillo, *Contracts* § 11–5, at 439 (3d ed. 1987); Restatement (Second) of Contracts § 250 (1981). A condition may be either a condition precedent to the formation of a contract or a condition precedent to performance under an existing contract. J. Calamari & J. Perillo, *Contracts* § 11–5, at 440 (3d ed. 1987). In the former situation, the contract itself does not exist unless and until the condition occurs. *Id.* With a condition precedent to performance, occurrence of the condition triggers the parties' duties under the contract. *See id.*

ESMI urges that the conditions here are conditions precedent to the formation of the contract with W & G, and that, because the conditions never occurred, no contract ever existed. Whether a condition is one precedent to formation or performance is a difficult question. *Id.* The determination is one of contract interpretation, a matter for the Court. The *Restatement* suggests that it is preferable "to view a contract as already in existence, but with the parties' respective performances subject to the specified event" or events, which condition the respective performances. Restatement (Second) of Contracts § 224 comment c and reporter's note (1981).[7]

Given this preference and the wording of the agreement between W & G and ESMI, read in conjunction with Styke's letter and the surrounding circumstances, the Court finds that the conditions here are conditions precedent to performance, not formation. It is not a reasonable interpretation of the agreement to say that ESMI's acceptance was contingent on the happening of the conditions. Also, the conduct of ESMI in executing a lease amendment (which explicitly ratified the lease) and paying the first-month's rent is not consistent with its argument that its acceptance was conditional.

W & G admits that the "effectiveness" of the W & G–ESMI lease was conditioned on the termination of the Safeway lease. It argues, however, that ESMI had a duty to await the occurrence of the conditions precedent, and that these conditions would have occurred had it not been for the repudiation of the lease by ESMI. W & G points out that the condition regarding the Safeway lease did not specify a time for the cancellation. W & G suggests that it is logical to assume that the termination of the old lease was to occur concurrently with the closing on the W & G–ESMI lease.

---

6. The Court uses the labels "landlord and tenant" and "lessor and lessee" herein for the purposes of convenience and clarity in identifying the parties. Use of these words, which of course have strict property-law meanings, should not be read as to presuppose the legal relationship of landlord and tenant, which is an issue in this case. While labels such as "proposed landlord" or "future lessee" might be more technically correct in certain stages of this analysis, such semantic exactness is unnecessary and unwieldy here.

7. The *Restatement* states that, in order for an event to be a condition, it must qualify a duty under an existing contract. "Events which are part of the process of formation of a contract, such as offer and acceptance, are therefore excluded under the definition in this section. It is not customary to call such events conditions." Restatement (Second) of Contracts § 224 comment c (1981).

W & G's argument is the better reasoned, and is well-grounded both in the facts and law. A cardinal principle of contract law regarding conditions is that, "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." Restatement (Second) of Contracts § 245 (1981); *see also* 4 A. Corbin, *Corbin on Contracts* § 977, at 920–22 (1951).[8]

This rule of law is related to the general duty of good faith and fair dealing imposed on a contracting party. This duty is a contract term implied by courts under the common law to prevent one party from unfairly taking advantage of the other party. *Coca–Cola Bottling of Elizabethtown v. Coca–Cola Co.*, 668 F.Supp. 906, 918 (D.Del.1987). The *Restatement* applies the term in every contract, *see* Restatement (Second) of Contracts § 205, and the duty requires a party to avoid hindering or preventing the other party's performance. 668 F.Supp. at 918 (citing E. Farnsworth, *Contracts* § 7.17 (1982)). As summarized by the Restatement, "[w]here a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing ... may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence." Restatement (Second) of Contracts § 245 comment a (1981).

Delaware law is in accord. *See, e.g.*, 6 Del.C. § 1–203 ("Every contract or duty within this subtitle imposes an obligation of good faith in its performance or enforcement."); *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del.Ch.1986) (modern contract law has generally recognized implied covenant to effect that each party to contract will act with good faith toward other with respect to subject matter of contract);

*Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch.1985) (implied covenant of good faith and fair dealing engrafted upon every contract); *Blish v. Thompson Automatic Arms Corp.*, 30 Del.Ch. 538, 64 A.2d 581, 597 (1948) (good faith "by express terms or by implication is written into every contract").

Also, Delaware courts follow the principle that a party who wrongfully prevents a thing from being done cannot avail itself of the nonperformance it has occasioned. *Mobile Communications Corp. of America v. MCI Communications Corp.*, No. 8108, 11 Del.J.Corp.L. 680, 685, 1985 WL 11574 (Del.Ch. Aug. 27, 1985) (party may not escape contractual liability by reliance upon failure of condition precedent when party wrongfully prevents performance of condition); *see also T.B. Cartmell Paint & Glass Co. v. Cartmell*, 186 A. 897, 903 (Del.Super.Ct.1936); *Martin v. Star Publishing Co.*, 126 A.2d 238, 242 (Del.1956) (impossibility of performance that will discharge contractual obligation must be created by fortuitous event and not by voluntary act of promisor); *City of Newark v. NVF Co.*, C.A. No. 5176, Brown, V.C. (Del.Ch. January 10, 1980) (same), *aff'd per curiam*, 435 A.2d 1043 (Del.1980).

This principle of law is often called the prevention doctrine. There exists a well-recognized exception to the doctrine: "[T]he prevention doctrine does not apply where, under the contract, one party assumes the risk that fulfillment of the condition precedent will be prevented." *Mobile Communications*, 11 Del.J.Corp.L. at 686. *See also* 3A A. Corbin, *Corbin on Contracts* § 767, at 545 (1960); 5 S. Williston, *A Treatise on the Law of Contracts* § 677A, at 235 (1961).

This exception has no application here. Nothing in the W & G–ESMI agreement states that either party assumed the risk that the conditions would not occur. Nor

---

**8.** Corbin states as follows:

A repudiation or other total breach by one party enables the other to get a judgment for damages or for restitution without performing acts that would otherwise have been conditions precedent. It is no longer necessary for the plaintiff to perform or to tender performance. This is true whether the repudiation is in express words or is by an act that makes performance by the repudiator apparently impossible or very improbable.

4 A. Corbin, *Corbin on Contracts* § 977, at 920–22 (1951) (citations omitted).

can such a term be implied. The agreement did not authorize a party to prevent the conditions from occurring and did not allocate the risk of non-occurrence. Thus, neither party had the right to hinder the happening of the conditions.

Implicit in ESMI's argument as to the conditions is the assumption that the Safeway lease termination was to occur in advance of the date of closing. Nothing in the W & G–ESMI lease itself or the surrounding circumstances supports this conclusion. Rather, common sense and the ordinary course of business dealings suggest that a lessor such as W & G would not cancel an old lease (thus leaving itself without a tenant and its rent) until the new tenant (ESMI) tendered performance under the new lease at closing.

The fact that the W & G–Safeway lease remained in effect through October 1, 1988, does not save ESMI's argument on this point. W & G can hardly be faulted for continuing to collect rent from Safeway after ESMI repudiated the W & G–ESMI lease.

Similarly, ESMI also argues that the contract with W & G was conditioned on the contingencies set forth in Styke's letter of December 3, 1987, and that these contingencies never occurred. In particular, ESMI focuses on the condition calling for an "agreement" from Safeway that the other Safeway store in Seaford (the "1405 store") would not be leased to a competing supermarket for a period of five years. Safeway delivered to ESMI a letter dated January 5, 1988, signed by Safeway's assistant vice president and assistant secretary. DA–100. In that letter, the Safeway officers agreed "that for five (5) years following the date hereof, Safeway will not use Store No. 1405 for the purpose of selling grocery merchandise, and will, in any assignment or sublease, restrict the use of Store No. 1405 by prohibiting the sale of grocery merchandise therein." DA–100.[9]

Because Safeway had the option of terminating its lease on the 1405 store and could not thereafter enforce its no-compete agreement, ESMI argues that the promise by Safeway was illusory and unenforceable.[10] Notably, ESMI did not object to the no-compete agreement upon receipt of Safeway's letter, but raised this argument for the first time in its briefs on these motions.

This argument by ESMI appears to be nothing more than another after-the-fact effort to find a hole in the W & G–ESMI contract. Contrary to ESMI's assertion, the no-compete promise by Safeway was not illusory. Safeway suffered a detriment in making the promise to the extent that it could not sell groceries at the 1405 store for a period of five years. It is true that Safeway could terminate the lease on the 1405 store and that Safeway would not thereafter be able to ensure that a new tenant did not sell groceries at that location. However, even upon such termination, Safeway was still obligated to "use its best efforts" to see that the restriction would continue. DA–100. ESMI is incorrect, then, when it asserts that Safeway did not promise anything and that Safeway did not restrict its future actions.

As to the other contingencies set forth in Styke's letter, the above analysis regarding the Safeway lease termination applies. There is every reason to believe, and a jury could certainly conclude, that these conditions would have occurred had it not been for the repudiation of the lease by ESMI. Thus, ESMI cannot prevail on its argument that its duties under the lease are excused by the non-occurrence of the conditions.

Viewing the facts as to the existence of a contract in the light most favorable to W & G, it cannot be said that ESMI has proved as a matter of law that no contract (or no contractual duties) existed because of the

---

9. The Safeway letter further stated that, "[i]n the event Safeway should voluntarily terminate its lease of Store 1405 prior to the expiration of said five (5) year period, Safeway shall use its best efforts to obtain the landlord's agreement that this restriction will continue to apply subsequent to the lease cancellation until the expiration of the five (5) year period." DA–100.

10. This argument by ESMI presupposes that the parties intended the word "agreement" to mean an enforceable contract.

failure of the conditions. Based on the factual disputes that remain, a jury could reasonably find that, had ESMI not wrongfully prevented the occurrence of the conditions by repudiating the agreement and failing to appear at the scheduled settlement, the conditions would have occurred.[11]

### B. *Existence of Leasehold Estate*

■ ESMI's next argument on its motion for summary judgment is that, even if the Court should find that a contract was formed between W & G and ESMI, the liquidated damages provision of the lease (and the related covenant to occupy and use the premises)[12] is inapplicable because a leasehold estate was never conveyed to ESMI and the resultant relationship of landlord and tenant never commenced. The argument concludes that, because W & G alleged no actual damages, ESMI is not liable for any damages.

ESMI relies principally on *Arthur Treacher's F. & C. v. Chillum Terrace, Ltd. P.*, 272 Md. 720, 327 A.2d 282 (1974).

**11.** The Court finds that, at least by February 3, 1989, after the parties executed the lease amendment and ESMI mailed the first-month's rent, an executory contract between W & G and ESMI existed. Factual questions remain, though, that preclude the Court from enforcing the liquidated damages clause in the contract at this time. For instance, a jury must determine whether the conditions would have occurred but for the repudiation by ESMI.

**12.** Paragraph 34C. of the lease, under the heading "Failure To Do Business", provides:

Tenant acknowledges that its continued occupancy of the Premises and the regular conduct of its business in one hundred percent of the space within the Premises for the permitted use are of the utmost importance to Landlord in avoiding the appearance and impression generally created by vacant space in the Shopping Center, and that Landlord will suffer substantial damage if the Premises are left vacant or are vacated by Tenant or if Tenant ceases to operate or conduct its business therein during the term of this Lease even in the event Tenant continues to pay rent as required hereunder. Tenant therefore covenants that it will occupy and utilize the entire Premises in the active conduct of business for the permitted use during the whole of the Lease term hereof and will conduct such business in a reputable, diligent and energetic manner, to the end that Landlord will receive the maximum amount of percentage rent to be derived from the Premises. This covenant

In *Arthur Treacher's*, a lessor brought an action against a lessee and its guarantor for unpaid rent when the lessee failed to take possession pursuant to a lease agreement. *Id.*, 327 A.2d at 283. The trial judge, construing the instrument as a valid lease agreement and finding that the lessee breached the agreement, awarded unpaid rent to the lessor. *Id.*, 327 A.2d at 285. On appeal, the lessee argued that, because the lease term had never commenced, the proper remedy was not the allegedly unpaid rent, but was damages appropriate for breach of contract. *Id.* The Court of Appeals of Maryland agreed with the lessee, and stated that the general rule for damages in such circumstances is that the lessor can recover the excess, if any, of the agreed rent over the reasonable rental value of the premises as of the date of the breach. *Id.*, 327 A.2d at 288.

The question of the appropriate measure of damages when a lessee refuses to take possession under an executed lease or executory agreement to lease is unsettled.[13]

by Tenant is a material consideration to the Landlord in order to induce Landlord to enter into this Lease. Landlord and Tenant agree that because of the difficulty or impossibility of determining Landlord's damages by way of loss of the anticipated percentage rent from Tenant or by way of loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance, then immediately upon breach by Tenant of its foregoing covenant, all remaining unpaid rent for the unexpired term of the Lease, including all additional rents and charges called for hereunder, shall become immediately due and payable to Landlord, and, in addition, Tenant shall immediately reimburse Landlord in full for the unamortized portion of upfitting costs incurred by Landlord in respect to the remodeling, upfitting, construction, or alteration of the premises performed by Landlord in respect to the Premises which were to be occupied by Tenant hereunder.

**13.** There is a distinction in both the rights and liabilities of the parties between a lease and an agreement for a lease. The question of whether an agreement is a lease or an agreement for a lease depends on the intent of the parties, as manifested by their agreement. The fact that the term of the lease is to commence in the future does not prevent the agreement from being a present lease. 49 Am.Jur.2d *Landlord & Tenant* § 18 (1970).

*See generally* Annotation, *Liability of Lessee Who Refuses to Take Possession Under Executed Lease or Executory Agreement to Lease*, 85 A.L.R.3d 514 (1978). Delaware law in particular is remarkably undeveloped on this issue. Delaware courts have addressed the issue of the measure of damages when a lessee *in possession* repudiates its lease. In such a situation, damages are the difference between the rent stipulated in the lease and the fair rental for the balance of the term. *Chavin v. H.H. Rosin & Co.*, 246 A.2d 921, 923 (Del.1968); *Curran v. Smith–Zollinger Co.*, 157 A. 432 (Del.Ch.1931).[14]

However, Delaware courts have seemingly not spoken on the damages issue in the pre-possession context. When the state courts have not spoken, the federal court must predict how the state's Supreme Court would rule when faced with that issue. *Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 702 (3d Cir.1988). Because there is no Delaware authority directly on point, the Court relies necessarily on more general principles of lease construction and the law of property and contracts.

Fundamentally, a lease is both a contract and a conveyance of an interest in land. *Lewes Sand Co. v. Graves*, 8 A.2d 21, 24 (Del.1939). Thus, two sets of obligations arise, one from the relationship of landlord and tenant coming from privity of estate and the other coming from the express provision of the contract and being based on privity of contract. 3 G. Thompson, *Real Property* § 1046 (repl. ed. 1980).

A landlord-tenant relationship exists only if the landlord transfers a present right to possession of the leased property. Restatement (Second) of Property § 1.2 comment a (1977). Whether an agreement between the parties with respect to leased property transfers to one of them the right to possession of the property depends on the intention of the parties, as revealed by the terms of their arrangement and the circumstances. *See id.* However, a landlord-tenant relationship may be made to commence upon the occurrence of an event. *Id.* § 1.8. In the latter situation, prior to the time that the tenant has the right to possession, the arrangement between the parties is not one of landlord and tenant, although the agreement itself may impose current obligations on the parties. *Id.* § 1.8 reporter's note.

The rule that the right to possession must be transferred to create a landlord-tenant relationship is "accepted dogma" in property law. *Id.* § 1.2 reporter's note. This view is to be distinguished from the even harsher rule of the early common law, in which actual possession (entry), not just a present right to possession, was necessary for the creation of a leasehold estate. The Statute of Uses[15] did away with this requirement. It is now the general rule that a lease becomes complete and takes effect on its execution, unless otherwise specified therein, and an entry by the lessee is not necessary to give it effect. 51C C.J.S. *Landlord & Tenant* § 307 (1968).

Thus, "[a]fter the execution of a valid lease, the rights of the landlord are practically the same whether the tenant refuses to take possession or enters and thereafter abandons the premises before the end of the term." 49 Am.Jur.2d *Landlord & Tenant* § 572 (1970). There remains, though, a distinction in the rights of the landlord depending on whether the tenant is in possession. The majority rule appears to be that, when a lessee refuses to take posses-

---

As to the agreement between W & G and ESMI, the Court construes the document to be a present lease, not a mere agreement to make a lease at some time in the future. Because the duties under the lease were contingent upon the happening of certain events, and ESMI had not yet taken possession, the lease was executory at the time of ESMI's repudiation.

**14.** These cases did not involve liquidated damages provisions. Nevertheless, they are of some guidance here.

**15.** The Statute of Uses was an English statute, enacted in 1536, directed against the practice of creating uses in lands, and which converted the purely equitable title of persons entitled to a use into a legal title or absolute ownership with right of possession. *Black's Law Dictionary* 1711 (4th ed. 1968).

sion pursuant to his agreement to do so, an action will not lie against him to recover the rent that he agreed to pay. *See* Annotation, *Liability of Lessee Who Refuses to Take Possession Under Executed Lease or Executory Agreement to Lease*, 85 A.L.R. 3d 514 (1978). Instead, his liability is for damages for breach of contract. The reasons for this rule are that the initial agreement (contract) for a lease does not create the relation of landlord and tenant and vests no estate in the proposed lessee, and that consequently the stipulated rent cannot be recovered as damages. 49 Am.Jur. 2d *Landlord & Tenant* §§ 23, 572 (1970); 51C C.J.S. *Landlord & Tenant* § 250(2) (1968).[16]

Based on this general rule, as enunciated in the *Arthur Treacher's* case, ESMI argues that W & G cannot collect liquidated damages here.[17] Crucial to ESMI's theory in this respect is the fact that the liquidated damages provision appears in the lease along with ESMI's covenant to occupy and use the premises. *See supra* note 9. Specifically, the lease states that liquidated damages will be paid upon breach of this covenant. *Id.* ESMI asserts that the covenant to occupy and use the premises was not binding upon it because the leasehold estate never existed, and therefore no liquidated damages can be awarded for breach of this covenant.

ESMI's argument regarding the ineffectiveness of the liquidated damages provision due to the lack of a leasehold estate fails for at least two reasons. First, it fails for the same reasons as does ESMI's contention concerning the conditions. Once again, ESMI is complaining about the nonoccurrence of something that would have happened had ESMI operated in good faith, awaited the fulfillment of its conditions and not repudiated the lease. There is little in the record to indicate that ESMI would not

have gotten possession had it not repudiated the lease—the facts suggest that W & G and Safeway were prepared to terminate their lease and that W & G was ready to accept ESMI's occupancy.

In other words, a leasehold interest likely would have been created had ESMI not repudiated the agreement. It is an unnecessarily mechanical application of property law and construction of this lease to say that, because no leasehold estate was created, the covenant to occupy and use, and the related liquidated damages provision, are inapplicable.

Contrary to ESMI's assertion, the fact that the conditions would have occurred had ESMI not repudiated the lease is not "immaterial" to the issue of whether ESMI breached the covenant to occupy and use the premises. ESMI signed a contract to occupy the Safeway space and paid the first-month's rent. As a lessee, ESMI had a duty to act in good faith and to await the occurrence of the conditions.[18] *See* 51C C.J.S. *Landlord & Tenant* § 249 (1968). After taking these actions, ESMI was not entitled to simply walk away from the lease at any time prior to its taking possession.

Second (and alternatively) ESMI's argument based on the *Arthur Treacher's* analysis fails because the Court can imply from the contract an independent promise on the part of ESMI to occupy the premises, the breach of which would activate the liquidated damages clause. The complications stemming from the explicit covenant to occupy and use arise because that covenant appears in the contract in conjunction with the liquidated damages provision, and does not specifically address the possibility of the pre-occupancy breach. In other words, the contract does not state: "Tenant covenants that it will occupy (enter) the premises, and that, if it fails to occupy the

---

**16.** This rule assumes that rent, like the real covenants in a lease, arises out of and inheres in the estate itself. *Arthur Treacher's F. & C. v. Chillum Terrace, Ltd. P.,* 272 Md. 720, 327 A.2d 282, 286–87 (1974). Thus the conclusion that, when there is no leasehold estate, there can be obligation to pay rent, as such.

**17.** Notably, *Arthur Treacher's* apparently did not involve a liquidated damages provision.

**18.** "[A] breach by the lessee is not to be excused by any act of his own or those in privity with him which prevented or rendered impossible the performance of his agreement." 51C C.J.S. *Landlord & Tenant* § 249 (1968).

premises (i.e. breaches this covenant), liquidated damages will be due."

While such a clause does not explicitly appear in the contract, the Court may imply it. Under the doctrine of necessary implication, a promise can be read into a contract in order to carry out the purpose for which the contract was made. *Danby v. Osteopathic Hosp. Ass'n of Dela.*, 101 A.2d 308, 313 (Del.Ch.1953). The *Danby* court summarized the principle as follows:

> Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are too obvious to need expression. They are implied only because they are necessary to give the contract the effect which the parties ... presumably would have agreed on, if, having in mind the possibilities of the situation which has arisen, they had contracted expressly in reference thereto.

*Id.* at 313–14. Construing the lease as a whole in light of the surrounding circumstances, the Court finds that the parties intended that ESMI would occupy the premises, and that, should ESMI not occupy, it would be liable for liquidated damages.[19] *See Slater v. Pearle Vision Center, Inc.*, 376 Pa.Super. 580, 546 A.2d 676, 681 (1988) (although lease for space in strip shopping center did not contain express requirement to occupy, obligation to occupy could be implied).[20]

The lease provisions that give rise to this implication include ESMI's explicit acknowledgement of the importance of occupancy of this space in the strip shopping center and its promise to actively occupy and use the premises for the entire lease term. The parties clearly contemplated a situation in which there were interdependent economic units, with the landlord having a vital interest in continued occupancy of the space for anchor tenants. As evidenced by the negotiations and Styke's repudiation letter of February 15, 1988, ESMI was well aware of the delicate economics of leasing space in Seaford Village, especially in light of the new Food Lion store nearby.

Awarding these liquidated damages upon a jury finding that the conditions would have occurred but for ESMI's repudiation is an admittedly harsh—but not punitive—result. However, as noted herein, ESMI was aware of the precarious economic situation at Seaford Village, and it knew the nature of the contract it had entered. "Because of the necessity for the presence of one or more large 'anchor' stores in order to establish a successful shopping center, major department store and supermarket tenants enjoy a considerable amount of bargaining power in the negotiation of shopping center leases." 2 R. Powell, *Powell on Real Property* ¶ 257[1][a] (1988). ESMI cannot therefore escape its contract merely because it made a bad bargain.

### C. *Validity of Liquidated Damages Clause*

ESMI's next principal argument on its summary judgment motion is that, even if the contract is enforceable and the liquidated damages clause is applicable, the clause is unenforceable as a penalty. This is also the focus of W & G's motion for partial summary judgment, in which it seeks to strike ESMI's defense in this regard. Whether a provision in a contract stipulating a certain amount payable upon a breach of the contract is penal or is one for liquidated damages is usually a matter

19. ESMI argues at page 41 of its Opening Brief: "It is apparent that the alleged liquidated damages provision did not contemplate the present circumstances, where the deal fell through while the premises were still under lease to Safeway." The Court finds that the provision did, albeit not explicitly, contemplate the present circumstances, and that the deal did not "fall through", but was repudiated by ESMI.

20. *See also Fifth Ave. Shopping Ctr. v. Grand U. Co.*, 491 F.Supp. 77 (N.D.Ga.1980) (under Georgia law, it is possible to infer implied covenant that lessee will operate its business in leased premises throughout term of lease); *Ingannamorte v. Kings Super Markets, Inc.*, 55 N.J. 223, 260 A.2d 841 (1970) (language of lease of store in shopping center and testimony as to negotiations established that tenant-assignee was obligated to operate supermarket on premises).

for the court to determine. 75 Am.Jur.2d *Trial* § 408 (1974); *see also Wilmington Housing Auth.*, 665 F.Supp. at 354–55 (factual issue as to *scope* of stipulated damages clause precluded court's determining whether clause was valid liquidated damages or penalty).

 It is well-established that parties to a contract may agree on a fixed sum to be paid as liquidated damages to compensate the non-breaching party in the event of breach. *Wilmington Housing Auth.*, 665 F.Supp. at 353. *See also Lee Builders, Inc. v. Wells*, 34 Del.Ch. 307, 103 A.2d 918, 919 (1954); *In re Ross & Son, Inc.*, 10 Del.Ch. 434, 95 A. 311, 315 (1915). But if the purpose of such a provision is not to compensate the non-breaching party, and is instead to punish the breaching party or ensure performance, the provision is void as a penalty. *Id.*

Delaware courts analyze the validity of a stipulated damages provision by applying the following test:

> Where (1) the damages that would result from a breach are uncertain or incapable of accurate calculation by any accepted rule of law, and (2) the amount fixed is a reasonable forecast of such damages, the provision is one for liquidated damages and will be enforced like any other. Conversely, if the provision fails to meet one of these criteria, the damages stemming from a breach being easily ascertainable or the amount fixed excessive, the provision is void as a penalty.

*Wilmington Housing Auth.*, 665 F.Supp. at 354 (citing *Gilbane Bldg. Co. v. Nemours Foundation*, 666 F.Supp. 649, 652 (D.Del.1985)); *see also Piccotti's Restaurant v. Gracie's Inc.*, C.A. No. 86C–MR–115, Babiarz, J., 1988 WL 15338 (Del.Super.Ct. February 23, 1988). This test parallels that of the *Restatement*. *See* Restatement (Second) of Contracts § 356 (1981).

ESMI does not dispute that the first element of the definition of a valid liquidated damages clause is met—that the damages that would result from a breach of the lease were uncertain or incapable of accurate calculation. Indeed, in the lease ESMI acknowledges "the difficulty or impossibility of determining Landlord's damages...." [21]

The remaining issue, then, is whether the liquidated damages provision was a reasonable forecast of such damages. Under Delaware law, it is a defendant's burden to demonstrate unreasonableness. *Pierce Associates, Inc. v. Nemours Foundation*, 865 F.2d 530, 546 (3d Cir.1988). ESMI argues that the provision was not a reasonable forecast for two reasons. First, says ESMI, the clause permits the landlord a double recovery of accelerated rent in addition to its power to repossess the premises and re-let to another tenant. Second, ESMI asserts that the stipulated damages are unreasonable in light of actual damages.

As discussed above, paragraph 34C of the lease contains ESMI's covenant to occupy and use the premises. DA–78–79. Paragraph 34A grants W & G the right to terminate the lease upon ESMI's failure to pay rent or otherwise comply with the covenants of the lease. DA–78. Upon the termination of ESMI's rights under the lease, W & G has the right to re-enter and repossess the premises. It also has the right to re-let the premises for the remaining term of the lease. DA–79. Paragraph 37A specifically provides that W & G's exercise of these rights does not relieve ESMI from the obligation to make all payments and fulfill all other covenants in the lease. DA–79–80.

W & G concedes that a lessor cannot recover possession of the premises and an amount representing solely accelerated rent. It argues, however, that the stipulated damages provision in paragraph 34C compensates W & G not only for the lost rental income but also for all of the conse-

---

**21.** *See generally* 2 R. Powell, *Powell on Real Property* ¶ 257[3][b][ii] (1988) ("When an anchor tenant ceases operation, the landlord and other tenants suffer even though the anchor tenant continues to pay the base rental. Moreover, the possibility of calculating damages appears difficult, since future percentages and the effect of nonoperation on neighboring tenants are such indefinite factors.")

quential damages resulting from ESMI's breach. This, W & G suggests, saves paragraph 34C from violating the damages rule prohibiting a double recovery.

The Court agrees. Of course, "the central objective behind the system of contract remedies is compensatory...." *Piccotti's Restaurant,* slip op. at 3. Damages for breach of contract should thus equal the loss actually sustained. *J.J. White, Inc. v. Metro. Merchandise Mart, Inc.,* 107 A.2d 892, 894 (Del.Super.Ct.1954).

Contrary to ESMI's assertion, the stipulated damages provision in the lease does not allow W & G to "have its' [sic] cake and eat it too." ESMI Br. at 35–36. Indeed, to the extent that there is cake in this case, it is on the face of ESMI for having signed and then repudiated this agreement.

The principle underlying ESMI's double-recovery argument is that a plaintiff in a contract action should not recover as liquidated damages an amount greater than it would have received had there been no default. *See Gary Outdoor Advertising Co. v. Sun Lodge, Inc.,* 650 P.2d 1222, 1225 (Ariz.1982). This general principle is not violated here. The stipulated damages bear a reasonable relation to the actual and consequential damages that could have been reasonably forecast by the parties at the time they drafted the clause.

ESMI specifically acknowledged in the lease "that Landlord will suffer substantial damage if the Premises are left vacant or are vacated by Tenant or if Tenant ceases to operate or conduct its business therein during the term of the Lease even in the event Tenant continues to pay rent as required hereunder." DA–78. The focus of the stipulated damages provision was on the necessity of an operating anchor tenant in the Safeway space, and the clause clearly contemplated damages beyond mere rent. The unique and often immeasurable nature of damages in the context of shopping center leases is well-known: "[E]ach store [in a shopping center], including the satellite stores, has its own appeal, and it is the totality of this effect that measures the flow of business. Thus, the success or failure of each store has a bearing on the center as a whole, and the loss of any one merchant may effect all merchants." 2 R. Powell, *Powell on Real Property* ¶ 257[1][a] (1988).

Beyond the fact that the stipulated damages here go well beyond compensation for lost rent, there is no guarantee that W & G will be able to re-let the premises to another food-store tenant. W & G certainly has the right under the lease to re-let the premises, but there is considerable uncertainty as to whether it will be able to find an attractive anchor tenant such as Safeway or ESMI, especially in light of the thin market for food stores in Seaford. Given the number of turndowns from potential tenants and the opening of the new Food Lion store across the street, finding such a tenant is unlikely. Moreover, the Court finds that, at the time of contracting, it was foreseeable that the Safeway premises might not be leased for several years if ESMI failed to occupy, and that W & G would suffer substantial damages in such circumstances.

The second prong of ESMI's argument that the stipulated damages clause was not a reasonable forecast of damages is that the stipulated damages are unreasonable in light of actual damages.[22] This argument misconceives the nature and purpose of liquidated damages. Parties to a contract may agree to the damages that will be paid upon breach in circumstances where the damages are difficult or impossible to calculate. *See Piccotti's Restaurant,* slip op. at 3–4. Liquidated damages thus arise in situations where actual damages "would be exceptionally difficult to calculate." *See id.* at 4.

The focus, then, is on damages contemplated at the time of contracting, not on the actual damages that may or may not be proved. *See id.* at 8 (viewing stipulated damages provision *at time of execution of contract*). Thus the rule that, where a

---

**22.** According to W & G, the liquidated damages amount under the lease is $1,640,000. It arrives at this figure by multiplying the per-square-foot annual rent ($4.00) by the total number of square feet (approximately 41,000) and the number of years in the intial term (ten).

contractual provision is construed to provide for reasonable liquidated damages, the provision will be enforced even though the plaintiff has not proven actual damages. *Id.* at 9.

The test for liquidated damages in Delaware is no different from that of the *Restatement. Wilmington Housing Auth.,* 665 F.Supp. at 354. Under the *Restatement,* "the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss." Restatement (Second) of Contracts § 356 comment b (1981). *See also* 22 Am.Jur.2d *Damages* § 705 (if clause was reasonable at time of its execution, it will be upheld despite fact that actual ensuing loss may be less than stipulated sum). Also, if the difficulty of proof of loss is great—as here—considerable latitude is allowed in the approximation of anticipated or actual harm. Restatement (Second) of Contracts § 356 comment b.

The Court has already discussed the special circumstances surrounding this lease. To allow ESMI to inject extensive evidence and argument as to the damages actually suffered by W & G would be to permit an end run around the liquidated damages provision in the lease. It is not unfair to hold ESMI to its agreement under these circumstances. "Each party by entering into such contractual provision took a calculated risk and is bound by reasonable contractual provisions pertaining to liquidated damages." *Piccotti's Restaurant,* slip op. at 9 (quoting *Southwest Engineering Co. v. United States,* 341 F.2d 998, 1003 (8th Cir. 1965)).

■ ESMI raises two additional issues relating to liquidated damages. First, ESMI asserts that, should the Court uphold the liquidated damages clause, any damages awarded should be discounted to

present value. In support of this proposition, ESMI cites no Delaware cases, and the Court is aware of none. In deciding whether to reduce liquidated damages to present value, courts look to the contract and the surrounding circumstances—in other words, there is no *per se* rule. *See, e.g., Heller Financial, Inc. v. Burry,* 633 F.Supp. 706, 707 (N.D.Ill.1986) (refusing to enforce provision in equipment leases for acceleration of all future rentals upon default, without any discount to present value); *Coe v. Thermasol, Ltd.,* 615 F.Supp. 316, 321 (W.D.N.C.1985) (upholding liquidated damages clause in lease for steambath units despite failure of clause to provide for reduction to present value).

The Court finds that discounting liquidated damages to present value under the present circumstances is contrary to the purpose of such damages and the intent of the parties. In agreeing to a liquidated damages clause, the parties acknowledged the difficulty of calculating any damages that might result from breach and decided upon a reasonable figure for such damages. Had the parties intended that this amount be reduced to present value, they could have so provided in the contract. *See, e.g., National Can Services v. Gateway Aluminum Co.,* 683 F.Supp. 719, 722 (E.D.Mo.1988); *Phila. Sav. Fund Soc. v. Deseret Management,* 632 F.Supp. 129, 137–38 (E.D.Pa.1985). Under the circumstances here, it was not unreasonable for the parties to have failed to provide for reduction of liquidated damages to present value.

Second, ESMI contends that its liability should be reduced by Safeway's payments to W & G after ESMI's repudiation on February 15, 1988.[23] W & G responds by arguing that the collateral source rule applies to bar any reduction. The collateral source rule provides:

---

**23.** Pursuant to their Second Lease Modification Agreement, made June 24, 1986, Safeway paid W & G monthly, square-footage rent of $22,-207.25. DA–51. Although Safeway ceased operations in the Seaford Village store on February 22, 1987, it continued paying W & G square-footage rent until it executed an Agreement for Termination and Release of Lease with W & G,

effective October 1, 1988. DA–5. The amount of rent paid by Safeway to W & G from March, 1988, through September, 1988, was $155,450.75 ($22,207.25 × 7). Also, upon termination of its lease with W & G, Safeway made a lump-sum payment of $450,000. DA–5. The total of these two figures is $605,450.75.

The wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him.

*Yarrington v. Thornburg*, 205 A.2d 1, 2 (Del.1964) (quoting 25 C.J.S. *Damages* § 99). W & G's argument that the collateral source rule applies here is not well taken. The application of the collateral source rule, traditionally a tort doctrine, to contract actions is an undecided issue in Delaware. A Delaware court has recognized that there is "some support for the application of the doctrine both in contract and in tort actions, especially where the alleged breach of contract sounds, at least partially, in tort." *Church Home Foundation, Inc. v. Homsey, Inc.*, C.A. No. 6513, Marvel, Ch. (Del.Ch., January 27, 1982).

However, the Court is unaware of any Delaware court that has gone so far as to apply the doctrine in a pure contract action such as the present case. Absent further guidance from the Delaware courts as to extension of the collateral source rule, this Court is unprepared to stretch the principle to fit these facts. The collateral source rule thus has no application here.

This does not mean, though, that ESMI is entitled to have its liability reduced by the amount of Safeway's post-repudiation payments to W & G. ESMI's request for a reduction based on the amount of Safeway's rental payments from March, 1988, through September, 1988, fails for the same reason as did ESMI's argument regarding double recovery. *See supra* at 1347–48. It would be inconsistent for the Court to say that the liquidated damages must be reduced by the Safeway rental payments, but not by rental payments from future tenants who may occupy the now-vacant Safeway space. The analysis as to both is the same. Tinkering with the liquidated damages amount at this stage is antithetical to the nature of such damages.

ESMI's request for a reduction based on the settlement between W & G and Safeway is more problematic. It is not clear from the facts on these motions whether W & G and ESMI contemplated the W & G–Safeway settlement when W & G and ESMI negotiated their lease. If the parties did anticipate this settlement, then there are no grounds for deducting the settlement amount ($450,000) from the liquidated damages. However, if W & G and ESMI did not contemplate such a settlement, then a strong case can be made that allowing W & G to retain the lump-sum payment from Safeway and the liquidated damages from ESMI would constitute an unforeseen windfall, and would be contrary to the parties' intentions.

In interpreting contractual language, the primary search is for the common meaning of the parties, not a meaning imposed on them by law. *Klair*, 531 A.2d at 223. That common meaning is simply not evident, nor can it be inferred, on these facts. Further fact-finding is necessary before the Court can determine whether W & G and ESMI reasonably anticipated a monetary settlement between W & G and Safeway. Therefore, should a jury determine that the conditions would have occurred but for ESMI's repudiation—thus activating the liquidated damages provision that the Court has held valid here—then W & G's recovery will be reduced by $450,000 only if the Court finds that W & G and ESMI did not contemplate the W & G–Safeway lump-sum settlement. No reduction is available for the amount of post-repudiation rental payments from Safeway to W & G.

### D. *Disputed Affidavit(s)*

In connection with its motion for partial summary judgment, W & G submitted an affidavit by David S. Zook, executive vice-president of Mark Development Co., the leasing agent and property manager of Seaford Village. The Zook affidavit purports to estimate W & G's actual damages resulting from the vacant Safeway space. Zook lists a number of tenants and prospective tenants who, in his opinion, either moved out of or declined to rent space in Seaford Village because of the vacant Safeway premises. He aggregates the annual lost rents as $602,573. Zook also cal-

culates the annual percentage rent lost as a result of the vacancy as $210,708.

Federal Rule of Civil Procedure 56(e) provides in pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed.R.Civ.P. 56(e). ESMI asserts that the Zook affidavit fails to meet these requirements and therefore should be stricken. Specifically, ESMI claims that Zook does not demonstrate that he is qualified as an expert to testify on the matters within the affidavit and that the affidavit does not set forth specific supportive facts.

The Court agrees, and thus will order the affidavit stricken. The Zook affidavit is a conclusory, three-page document, and Zook does not sufficiently establish himself as an expert or set forth the facts upon which his conclusions are based. As to the tenants who either left Seaford Village or declined to rent there, Zook summarily states that it is his opinion that the vacant Safeway premises were "the paramount consideration for their decision[s]...." However, he gives no further information about these decisions. Regarding the lost percentage rentals, Zook refers to data from the Urban Land Institute, but does not recite what this data is or how it affected his determination. For these reasons, the Zook affidavit is facially deficient and must be stricken.

In opposition to W & G's motion, ESMI submitted an affidavit by Daniel J. Bartz, an accountant. Bartz concludes that "Zook's conclusions are without proper foundation, not based on any accounting or economic probability, and are innapropriate and inaccurate" in a number of other respects. ESMI argues that, should the Court grant ESMI's motion to strike, the Court must deny W & G's motion for partial summary judgment because the Bartz affidavit creates an issue of fact as to actual damages.

This argument is incorrect. It confuses a factual dispute over the amount of actual damages with the legal question of the reasonableness of a stipulated damages clause. On its motion, W & G is asking the Court to hold valid the stipulated damages clause (and to strike ESMI's defense in that regard). While actual damages may be relevant to this determination by the Court, the fact that there is a dispute as to the amount of actual damages does not preclude the Court from ruling on the validity of the clause. Were the law otherwise, every factual dispute on actual damages would prevent a plaintiff from enforcing a stipulated damages provision.

### E. *Relief under Rule 56(f)*

Finally, ESMI argues that the Court should grant it relief under Rule 56(f). That rule provides as follows:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). Based on this rule, ESMI seeks additional discovery on the issue of actual damages.

Underlying ESMI's request is its mistaken assumption that the Court must specifically determine actual damages. The Court finds that additional information relating to actual damages is unnecessary for it to rule on W & G's motion. "[W]here the discovery sought would not meet the issue that the moving party contends contains no genuine issue of fact, it is not an abuse of discretion to decide the motion for summary judgment without granting discovery." *Powers v. McGuigan*, 769 F.2d 72, 76 (2d Cir.1985).

One of the objects of a stipulated damages clause is to avoid a controversy over the amount of actual damages. In seeking to introduce additional evidence as to actual damages, ESMI is attempting to create the very type of dispute that it contracted to avoid.

**1352**

As noted above, the stipulated damages amount must be reasonable in light of the anticipated *or* actual loss. Restatement (Second) of Contracts § 356 (1981). This is a disjunctive, not a conjunctive, standard. Implicit in ESMI's arguments throughout these motions is the suggestion that the liquidated damages clause must be proved reasonable under both anticipated and actual damages. That is simply not the rule under Delaware law. *See Piccotti's Restaurant,* slip op. at 7. The Court has found the stipulated damages clause reasonable in light of the damages that could be anticipated at the time of contracting. No further evidence is required to hold this clause valid, and the Court will not grant relief under Fed.R.Civ.P. 56(f).

### III. CONCLUSION

For the foregoing reasons, ESMI's motion for summary judgment is denied. W & G's motion for partial summary judgment is granted, and ESMI's defense that the liquidated damages clause is invalid is therefore stricken. ESMI's motion to strike the Zook affidavit is granted, but its motion for relief under Fed.R.Civ.P. 56(f) is denied.

The Court has held that the parties' lease agreement is a contract and that the liquidated damages provision therein is valid. Should a jury determine that the conditions in the contract would have occurred but for ESMI's repudiation, then the duties under the contract will be enforceable and the liquidated damages clause will be activated. In that event, the damages awarded to W & G will be reduced by the amount of the lump-sum settlement between W & G and Safeway if the requisite factual finding is made.

The Court will enter an Order in accordance with this Opinion.