# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SMART SAND, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. N19C-01-144 |
| | ) | PRW CCLD |
| US WELL SERVICES LLC, | ) | |
| Defendant. | ) | |

Submitted: May 7, 2021
Decided: June 1, 2021
Issued: June 11, 2021*

## <u>DECISION AFTER TRIAL</u>

Neal J. Levitsky, Esquire, Seth A. Niederman, Esquire, FOX ROTHSCHILD LLP, Wilmington, Delaware; Steven J. Daroci, Esquire, FOX ROTHSCHILD LLP, Lawrenceville, New Jersey, *Attorneys for Plaintiff Smart Sand, Inc.*

Richard P. Rollo, Esquire, Travis S. Hunter, Esquire, Alexandra M. Ewing, Esquire, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Stephen H. Lee, Esquire, Mary Anna H. Rutledge, Esquire, PORTER LEDGES LLP, Houston, Texas, *Attorneys for Defendant US Well Services LLC.*

**WALLACE, J.**

In 2019, Plaintiff Smart Sand, Inc., filed its Complaint alleging non-payment under the parties' Master Product Purchase Agreement (together with its amendment executed on May 1, 2016, the "PPA"), and Railcar Usage Agreement (collectively the "Agreements").[1] Defendant US Well Services LLC, counterclaimed alleging breach of the implied covenant of good faith and fair dealing, tortious interference with business customers, breach of contract, and seeking declaratory judgment related to its termination of the PPA.[2]

On Smart Sand's earlier motion, the Court dismissed US Well's breach of the implied covenant and tortious interference claims, leaving US Well's breach-of-contract and declaratory judgment counterclaims.[3]

Smart Sand then filed its First Amended and Supplemental Complaint, adding claims for additional amounts due under the PPA.[4] When the Agreements expired in April 2020, Smart Sand filed its Second Amended and Supplemental Complaint, adding a claim for US Well's non-payment of Smart Sand's final invoice.[5]

---

\* This decision is issued after consideration of the parties' requests for redaction of certain non-parties' confidential information and with the Court's own necessary corrections.

[1] Compl., Jan. 14, 2019 (D.I. 1).

[2] First Am. Countercls., Apr. 18, 2019 (D.I. 17).

[3] Judicial Action Form, June 19, 2019 (D.I. 39).

[4] First Am. Compl., Aug. 28, 2019 (D.I. 55).

[5] Second Am. Compl., June 10, 2020 (D.I. 200).

After myriad discovery disputes, fact and expert discovery closed in late 2020.[6]

The Court then heard, and subsequently denied, the parties' Cross Motions for Summary Judgment and Motions *in Limine*.[7] Finally, in mid-December 2020, a trial commenced on the remaining factual issues.[8]

## I. THE TRIAL

The Court heard testimony during a five-day bench trial. Thereafter, the parties submitted post-trial briefings and motions. The respective cases were deemed fully submitted for decision in February 2021.

During trial, the Court heard from and considered the testimony of the following witnesses:

| | |
|---|---|
| Lee Beckelman | Joel Broussard (by deposition) |
| William John Young | Kyle O'Neill (by deposition) |
| Ronald Wheelan | Brian Stewart (by deposition) |
| Stephen L. Becker | Nathan Houston |
| Christopher LaBarte (by deposition) | Brian Savisky |
| Matthew Bernard (by deposition) | Dana M. Trexler |

---

[6] The Court greatly appreciates the invaluable service of appointed Special Master Matthew F. Boyer in deftly addressing the parties' numerous discovery disagreements during the pendency of this matter.

[7] Judicial Action Form, Nov. 24, 2020 (D.I. 317).

[8] Trial Worksheet, Jan. 4, 2021 (D.I. 327).

The parties also submitted an extensive number of exhibits, most of which were admitted without objection and are cited herein by their designations as joint exhibits.

## II. FINDINGS OF FACT

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law. To the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[9]

### A. THE PARTIES

Smart Sand is a Delaware corporation with its principal place of business in The Woodlands, Texas.[10] Smart Sand is a domestic producer and supplier of frac sand, a mineral product commonly used in the oil and gas industry.[11] US Well is a Delaware limited liability company with its principal place of business in Houston,

---

[9] *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority).

[10] Second Am. and Supp. Compl. ¶ 1.

[11] Compl. ¶ 1; *see generally* Hobart M. King, *What is Frac Sand?*, GEOLOGY.COM—GEOSCIENCE NEWS AND INFORMATION, https://geology.com/articles/frac-sand/ (last visited May 27, 2021) ("'Frac sand' is a high-purity quartz sand with very durable and very round grains. It is a crush-resistant material produced for use by the petroleum industry. It is used in the hydraulic fracturing process (known as 'fracking') to produce petroleum fluids, such as oil, natural gas, and natural gas liquids from rock units that lack adequate pore space for these fluids to flow to a well.").

Texas.[12] US Well is an oilfield service company that provides hydraulic fracturing services, including pressure pumping, to oil and gas exploration and production companies.[13]

## B. THE AGREEMENTS

On November 6, 2015, Smart Sand and US Well entered into a Master Product Purchase Agreement through which Smart Sand supplied frac sand to US Well.[14] The PPA required US Well to pay a monthly non-refundable capacity reservation charge, regardless of whether US Well actually purchased and took any frac sand for the given month (the "Reservation Charge").[15]

The PPA required US Well to purchase a total of two million tons of sand over a four-to-seven-year period at prices that fluctuated based on various factors.[16] If US Well failed to purchase the required amount of sand in any contract year, it was required to pay an annual "True Up Payment" equal to $40 multiplied by the

---

[12]  *Id.* ¶ 2.

[13]  First Am. Countercls. ¶ 3.

[14]  Compl. ¶¶ 3, 7; First Am. Countercls. ¶ 3.

[15]  Compl. ¶ 10.

[16]  First Am. Countercls. ¶ 5; Joint Exhibit 1 ("JX") (PPA §§ 1.1, 1.2, 7.1) (D.I. 338 – letter from Seth Niederman enclosing the electronic media containing the Joint Trial Exhibits; D.I. 339 – Joint Exhibits List).

difference between the Minimum Tons per Year ("MTPY") amount and the actual tons purchased.[17]

At the same time, the parties also entered into a Railcar Usage Agreement ("RUA").[18] Under the RUA, US Well "borrowed" railcars from Smart Sand for the delivery of sand purchased under the PPA in exchange for a monthly fee of $650 per railcar.[19] The RUA's term continued until the termination or expiration of the PPA.[20]

Upon the expiration of the four-to-seven-year term, US Well was required, under PPA Section 1.5(c), to pay a Cumulative Shortfall Payment ("CSP") "equal to $40 multiplied by the difference between the aggregate [MTPY] during the Term (i.e. 2,000,000 tons)" and the actual tons of sand purchased by US Well during the term, reduced by the amount of any prior True Up Payments and Unused Reservation Charges.[21]

In the fall of 2018, US Well stopped purchasing sand from Smart Sand, and ceased meeting its payment obligations.[22] In January 2019, US Well purported to

---

[17]  JX-2 (First Am. to PPA § 1.2).

[18]  Compl. ¶¶ 3, 7; First Am. Countercls. ¶ 6.

[19]  JX-4 (RUA).

[20]  *Id.*

[21]  JX-2 (First Am. to PPA § 1.3).

[22]  JX-268 (Oct. 24, 2018 email correspondence re: Smart Sand Prepayment), JX-278 (Nov. 1, 2018 email correspondence re: Smart Sand Oct. Railcar Usage Invoice), JX-373 (Final Invoice).

terminate the Agreements, retroactively from September 1, 2018, claiming that Smart Sand breached the PPA.[23] The PPA expired on April 30, 2020.[24] According to Smart Sand's final invoice, US Well purchased 793,176.47 tons of sand, leading to a reported shortfall of 1,206,823.53 tons.[25]

From the time of US Well's purported termination of the Agreements to the time Smart Sand calculated the earliest possible PPA expiration, Smart Sand sent US Well multiple invoices for amounts it deemed due under the PPA.[26] On May 4, 2020, Smart Sand sent US Well a final invoice setting forth all amounts Smart Sand claimed were due and payable under the Agreements.[27] The final invoice included the CSP of $48,272,941.20 and Railway Fees of $5,850,000. According to Smart Sand, that CSP calculation "represents the total shortfall obligation of [US Well] under the PPA for the tons it failed to purchase at the $40-per-ton rate and is inclusive of prior Reservation Charges and shortfall/deferred tonnage invoicing that [US Well] failed to pay."[28]

---

[23] JX-333 (Jan. 11, 2019 US Well Termination Letter).

[24] Trial Tr., Dec. 14, 2020, at 104 (Lee Beckelman) (D.I. 347).

[25] JX-373 (Final Invoice).

[26] JX-346 (Contract Year 3 True Up Payment Invoice and Deferral Elimination Payment Invoice).

[27] JX-373 (Final Invoice).

[28] *Id.*

## C. CERTAIN KEY TRIAL TESTIMONY

The trial began on December 14, 2020, with Lee Beckelman, Smart Sand's Chief Financial Officer, as the first witness.[29]  Mr. Beckelman testified to his business understanding of the frac sand industry, the Agreements between Smart Sand and US Well, and the cumulative shortfall payment calculation.[30]

Mr. Beckelman explained that long-term take-or-pay contracts are used in the industry to foster stability and consistency in what is an unstable market.[31] Mr. Beckelman pointed to the Producer Price Index ("PPI") and the various bands[32] used in the contract as an indication of that instability:

> PPI is basically trying to represent what inflation is and so it represents a kind of general inflation number that may be in the economy or related to a particular activity. So PPI is a Producer Price Index and so it's activity that basically – what the inflation of increasing in pricing is over time and it's an index that is calculated and published . . . periodically.[33]

And, Mr. Beckelman testified, between 2010 and 2016, the price of oil—

---

[29]  Trial Tr., Dec. 14, 2020, at 17-18.

[30]  *Id.* at 20-23, 25, 26, 32.

[31]  *Id.* at 51, 64 ("[I]t helps both sides to have consistency of their business over a period of time, because we both know there is a lot of uncertainty in our business in terms of supply and demand.").

[32]  The PPI includes "five pricing bands based on WTR." *Id.* at 90.

[33]  *Id.* at 91.

which directly affected the price of frac sand—fluctuated within range of $20/barrel on the low end to a $100/barrel high.[34] As such, Mr. Beckelman explained, Smart Sand could not reliably project potential profits (or losses) at the time the contract was signed.[35] Additionally, Mr. Beckelman recounted that, in negotiations over the amended PPA, it was US Well that asked for a $40/ton no-take rate, and Smart Sand that agreed thereto.[36]

Concerning the CSP, Mr. Beckelman told the Court that it represented the accumulation of the separate shortfall payments, and as such Smart Sand is not pursuing the previously unpaid invoices "[b]ecause they are not included in the cumulative final shortfall payment[.]"[37] According to Mr. Beckelman, the PPA was intended to provide US Well with two million tons of sand, and the various provisions within the PPA simply provided US Well with mechanisms to defer when that volume's transfer would be complete.[38]

Next, John Young, Smart Sand's Chief Operating Officer, testified as to how

---

[34] *Id.* at 98-99.

[35] *Id.* at 149-50.

[36] *Id.* at 154 ("US Well did not ask to reconsider the $40 a ton. Again, in November 2015, they requested the $40 a ton and we agreed to it.").

[37] *Id.* at 45.

[38] *Id.* at 96.

the $40/ton shortfall figure was established.[39]  Specifically, Mr. Young recounted that US Well's then Chief Executive Officer Brian Stewart had requested the $40/ton shortfall during negotiations over the amended PPA, and that Smart Sand accepted it.[40]  Additionally, Mr. Young conveyed that when the amended PPA was executed (which included the reduced shortfall amount) the invoiced price for coarse sand sent to US Well was $45.03/ton.[41]

Ronald Wheelan, Smart Sand's Executive Vice President of Sales, then explained how Smart Sand established its pricing.  Mr. Wheelan testified that after US Well stopped taking sand from Smart Sand, the parties attempted to renegotiate but failed to come to agreement.[42]

Then, Smart Sand's expert witness Stephen Becker, founding partner of Applied Economics Consulting Group, was called.[43]  Dr. Becker, as an expert in damage quantification, testified to the amount and type of sand US Well took under the PPA, based on the invoices.[44]  Dr. Becker calculated that a total of 793,205 tons

---

[39]  Trial Tr., Dec. 15, 2020, at 93-94 (John Young) (D.I. 326).

[40]  *Id.* at 98-99 (citing JX-50), 100.

[41]  *Id.* at 105 (citing JX-429).

[42]  Trial Tr., Dec. 16, 2020, at 154-55, 159 (Ronald Wheelan) (D.I. 348).

[43]  *Id.* at 179 (Stephen Becker).

[44]  *Id.* at 187-88.

of sand had actually been delivered to US Well.[45]

The Court also heard, through video depositions, the testimony of Christopher LaBarte, Matthew Bernard, Joel Broussard, and Kyle O'Neill.[46]

In addition, the Court heard both the video deposition and live testimony of US Well's former Chief Executive Officer Brian Stewart, US Well's Rule 30(b)(6) witness.[47]

Mr. Stewart testified that in the original contract, the shortfall payment was the full purchase price.[48] During later negotiations aimed at amending that original contract, Mr. Stewart admitted that he proposed a reduction of the shortfall to the $40/ton figure and that was ultimately accepted by both sides.[49] Mr. Stewart said that while he did not know how much money Smart Sand would save by not mining and delivering the sand to US Well, he knew it was below the full purchase price.[50] Further, Mr. Stewart testified that US Well itself performed no analysis of whether the $40/ton figure was representative of Smart Sand's potential damages if US Well

---

[45] *Id.* at 192-93 (Becker's calculation is the result of an accumulation of the Cumulative Purchased Tons totals listed in the first to last invoice rendered by Smart Sand to US Well).

[46] Trial Tr., Dec. 16, 2020, at 202 (Christopher LaBarte), 203 (Joel Broussard), 204 (Matthew Bernard); Trial Tr., Dec. 17, 2020 AM, at 8 (Kyle O'Neill) (D.I. 349).

[47] Trial Tr., Dec. 17, 2020 AM, at 8 (Brian Stewart).

[48] *Id.* at 12.

[49] *Id.* at 13.

[50] *Id.*

did not buy the sand, and Smart Sand provided no such analysis.[51]

At bottom, Mr. Stewart confirmed that $40/ton shortfall figure was "a reasonable compromise based on the information that [US Well] had at the time."[52]

Next, Nathan Houston, US Well's former Chief Operating Officer and Chief Executive Officer testified about his efforts to renegotiate the amended PPA with Smart Sand to "lower the sand and the price point [to] where [US Well] could be competitive with it, reduce volumes, come up with some alternative . . . solutions to running the sand."[53]

US Well then called its expert Brian Savisky, principal research analyst at IHS Markit, to present his historic and forecasted market projections for the price of frac sand.[54]  Mr. Savisky confirmed that the "average pricing for northern white sand post-October 2018 [did not] reach $40 per ton[.]"[55]

US Well called a second expert witness, Dana Trexler, managing director at Stout.[56]  According to Ms. Trexler, Smart Sand's reasonably foreseeable lost profits

---

[51]  *Id.* at 15-16.

[52]  *Id.* at 19.

[53]  Trial Tr., Dec. 17, 2020 PM, at 9, 24 (Nathan Houston) (D.I. 325).

[54]  *Id.* at 57, 72, 77 (Brian Savisky).

[55]  *Id.* at 78.

[56]  Trial Tr., Dec. 18, 2020, at 14 (Dana Trexler) (D.I. 346).

were estimable at the time of contracting, and the amount Smart Sand claims it is owed was not a reasonable estimate of those lost profits.[57] Ms. Trexler asserted that Smart Sand "had the necessary components available to them to perform an analysis which would have allowed them to estimate potential lost profits under the PPA at any point in time."[58] Ms. Trexler opined that, using certain calculations under her read of the Agreements, US Well would owe Smart Sand an incomprehensible sum of $105,295,290.[59]

Ms. Trexler testified that Smart Sand's retained product had value and calculated the value of that sand at different points in time.[60] Additionally, in Ms. Trexler's view, the $40/ton "fee does not approximate estimable lost profits at the time of entering into the contract."[61]

Finally, Dr. Becker was recalled by Smart Sand to rebut Ms. Trexler's opinions on "the reasonableness of the contractual liquidated damages under the PPA, calculating lost profit damages under the PPA and RUA, and/or analysis of

---

[57] *Id.* at 19-20.

[58] *Id.* at 29.

[59] *Id.* at 35.

[60] *Id.* at 48.

[61] *Id.* at 54-55.

other frac sand market economics."[62]

## III. GENERAL LEGAL PRINCIPLES

Though the Court sits without a jury, it has applied the same principles of law in its deliberations and consideration of each individual claim and counterclaim that it would have more formally instructed a jury to follow. The Court may highlight here some of those that are most applicable to this particular case. But the fact that some particular point or concept may be mentioned here should not be regarded as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and the parties' claims and counterclaims.

In reaching its verdict, the Court has examined the joint exhibits submitted and considered the testimony of all witnesses, both on direct and cross. The Court has also considered the applicable Delaware case law that has defined the legal precepts applicable here. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits and only used for its deliberation that which would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial, during the trial proceedings, and post-trial. And, of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

---

[62] *Id.* at 163-64 (Stephen Becker – Recalled).

The Court then reviewed and applied the very instructions that it would give a jury in these circumstances.[63]

In this particular case, Smart Sand carries the burden of proof by a preponderance of the evidence[64] on Counts IV and V of its Complaint.

## IV. FINDINGS AND VERDICT

At trial there were three central issues to be resolved: (1) whether PPA Section 1.5's take-or-pay provision is enforceable, (2) whether Smart Sand is entitled to damages based on US Well's breach of the RUA, and (3) whether either party is entitled to attorneys' fees or prejudgment interest.[65] In its post-trial briefing, US Well stated that it is no longer pursuing its single remaining counterclaim (Breach of the PPA confidentiality provision) (Counterclaim I).[66]

So the only claims left for the Court to resolve are Smart Sand's breach-of-contract claims aimed at US Well's non-payment of the final invoice and railcar usage fees (Counts IV and V).

---

[63] *See, e.g.*, Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[64] *See, e.g.*, *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984) (same).

[65] USW Post-Trial Br. at 5-6, Jan. 29, 2021 (D.I. 330).

[66] *Id.* at 3 n.3; *see* USW's Second Am. Countercl. ¶¶ 23-28, Nov. 7, 2019 (D.I. 113).

-14-

## A. THE PPA'S TAKE-OR-PAY PROVISION SETS OUT VALID LIQUIDATED DAMAGES AND IS, THEREFORE, ENFORCEABLE.

PPA Section 1.5(c) states:

> Buyer shall pay to Smart Sand on or before the date that is thirty (30) days following the end of the Term an amount (the "**Cumulative Shortfall Payment**") equal to $40 multiplied by the difference between the aggregate Minimum Tons per Year during the Term (i.e. 2,000,000 tons) and the actual tons of Products (including any tonnages of substituted 60/ 140 (aka 100 mesh) at the ratio and proportion set forth in Section 1.1 and Appendix B) purchased by the Buyer during the Term (**"Cumulative Purchased Tons"**) plus tons of Replacement Products (the resulting amount, the **"Cumulative Net Tons"**) minus any True Up Payment paid during the Term minus any Unused Reservation Charge for the final Contract Year of the Terns (i.e. (i) Cumulative Net Tons = 2,000,000 - (Cumulative Purchased Tons + tons of Replacement Products), and (ii) Cumulative Shortfall Payment = (Cumulative Net Tons * $40) - prior True Up Payments - Unused Reservation Charge for the final Contract Year of the Term. If the Cumulative Net Tons is equal to or less than 0, then the Cumulative Shortfall Payment shall be $0.[67]

US Well says that PPA Section 1.5(c)'s take-or-pay provision is not a (valid) liquidated damages clause, but instead simply constitutes choices of alternative performance—or, ultimately, an unenforceable penalty.[68] Smart Sand maintains that Section 1.5(c) is a valid liquidated damages clause.[69]

US Well carries the burden of demonstrating that this questioned provision is

---

[67] JX-3 (emphasis in original) (composite of Amended and Restated PPA and First Am. PPA).

[68] USW Post-Trial Br. at 11.

[69] SSI Post-Trial Br. at 1, Jan. 29, 2021 (D.I. 332).

not a valid liquidated damages clause supporting the sum Smart Sand claims is now due thereunder.[70]

First, US Well turns to section 8:32 of White & Summers's Treatise on the Uniform Commercial Code's discussion of take-or-pay contracts to the effect that a majority of courts have found the "pay" provision in take-or-pay contracts to be only a form of alternative performance a party might choose.[71] Yet White & Summers continue that "it is often difficult to distinguish between a provision for alternative performance and an agreed remedy."[72]

So, US Well cites to *S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*[73] and *Brazen v. Bell Atlantic Corp.*,[74] to propose that for a provision to constitute liquidated damages, it must be specifically stated.[75] And US Well suggests the

---

[70] *See S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at *3 (Del. Super. Ct. May 21, 1997) ("[T]he Court first notes that the presumption is in favor of the validity of a liquidated damages provision . . . . It is up to the party opposing the liquidated damages clause to demonstrate that it is invalid and unenforceable." (citations omitted)); *see also Princess Hotels, Int'l Inc. v. Del. State Bar Ass'n*, 1997 WL 817853, at *3 (Del. Oct. 29, 1997) ("Without defendant putting forth anything to attack the liquidation clause, the presumption in favor of the liquidated damages provision prevails.").

[71] 1 WHITE, SUMMERS & HILLMAN, UNIFORM COMMERCIAL CODE § 8.32 n.16 (6th ed. 2020) (hereinafter, "WHITE & SUMMERS") (collecting cases); *see also* USW Post-Trial Br. at 12.

[72] WHITE & SUMMERS § 8:32.

[73] 1997 WL 817883 (Del. Super. Ct. May 21, 1997).

[74] 695 A.2d 43 (Del. 1997).

[75] USW Post-Trial Br. at 13-14.

absence of words like "breach," "remedy," or "damages" means that Section 1.5(c) is not a liquidated damages provision but instead merely defines an alternative performance.[76] But, as Smart Sand rightly contends, no set incantation is needed to define whether a contract's language constitutes a liquidated damages clause.[77]

US Well also cites White & Summers to suggest that a material-breach-remedy provision elsewhere in a contract suggests that a take-or-pay provision is not a recognizable liquidated damages clause.[78] US Well points to PPA Section 7.4 as the remedy for a material breach, but to little avail.[79]

Both parties turn to other courts to support their preferred interpretation of the PPA's take-or-pay clause. US Well cites *Roye Realty & Developing, Inc. v. Arkla, Inc.*, where the Oklahoma Supreme Court found that a contested take-or-pay contract

---

[76] USW Post-Trial Br. at 15-16.

[77] SSI Post-Trial Ans. Br. at 7, Feb. 12, 2021 (D.I. 340) (citing *W & G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*, 714 F. Supp. 1336, 1343 (D. Del. 1989)). For instance, in *Delaware Bay Surgical Services, P.C. v. Swier*, the Delaware Supreme Court upheld the finding of a liquidated damages provision that explicitly used the word "penalty." 900 A.2d 646, 650-51 (Del. 2006).

[78] USW cites to cases listed in WHITE & SUMMERS § 8:32 to show that courts have interpreted "take-or-pay" to mean alternative performance. Conclusive in that listing is whether remedies for breach are addressed elsewhere in the contract. And here, USW says they are addressed in PPA Sections 7.2, 7.3, and 7.4. USW Post-Trial Br. at 12.

[79] *Id.* at 15 (citing PPA § 7.4). Of particular relevance, PPA Section 7.4 states that "in the event Buyer terminates this Agreement pursuant to Section 7.2, Buyer shall pay, within thirty (30) days of the effective date of termination, all amounts due and owing to Smart Sand for Products delivered by Smart Sand prior to the effective date of termination, payment for any Outstanding Deferred Tons at the rate of $40 per ton, and all other amounts payable by Buyer hereunder that have accrued but remain unpaid at the effective date of termination. . . ."

didn't provide a proper measure of damages.[80] Smart Sand counters that *Roye Realty* is of no use because the court there decided the narrow issue of the measure of damages for anticipatory repudiation—and here there was no anticipatory repudiation because the PPA had expired by its own terms.[81] To this, Smart Sand adds *Jeddo Coal Co. v. Rio Tinto Procurement (Singapore) Ptd Ltd.*, where the federal district court found that a take-or-pay clause was indeed an enforceable liquidated damages provision.[82]

## 1. PPA Section 1.5 is a Valid Liquidated Damages Provision.

US Well insists that PPA Section 1.5(c) is not a valid liquidated damages provision.[83] Smart Sand says it is.[84] Again, as liquidated damages are presumed valid, US Well, the party contesting the provision, has the burden of proof.[85]

"[L]iquidated damages, by definition, are damages paid in the event of a

---

[80]  *Id.* at 17 (citing *Roye Realty & Dev'g, Inc. v. Arkla, Inc.*, 863 P.2d 1150, 1154 (Okla. 1993) (holding that "[b]ecause the provisions of the UCC apply to gas purchase contracts . . . the measure of damages for anticipatory repudiation of both the take and the pay obligations in a take-or-pay gas purchase contract is the difference between the market price at the time when the aggrieved party learned of the repudiation and the unpaid contract price." (citations omitted))).

[81]  SSI Post-Trial Ans. Br. at 11-13.

[82]  *Id.* at 10 (citing *Jeddo Coal Co. v. Rio Tinto Procurement (Singapore) Ptd Ltd.*, 2020 WL 3474078 (M.D. Pa. Feb. 10, 2020)).

[83]  USW Post-Trial Ans. Br. at 2, Feb. 12, 2021 (D.I. 336).

[84]  SSI Post-Trial Br. at 1.

[85]  *See supra* note 70 & accompanying text.

breach of contract."[86]  Delaware Courts routinely enforce liquidated damages provisions when damages are uncertain at the time of contracting and when the liquidated damages due are reasonable.[87]  The role of liquidated damages is to compensate, not to punish; if such a provision is aimed at "punish[ing] the breaching party or ensur[ing] performance, the provision is void as a penalty."[88]  As a part of its liquidated-damages-vs.-penalty analysis, a court should figure out the parties' intent when contracting.[89]

Delaware courts engage a two-step examination to determine whether a liquidated damages provision is valid, or whether it represents a penalty and is thus void.[90]  The first inquiry is whether "damages were uncertain" at the time of

---

[86]  *Brazen*, 695 A.2d at 47 (citations omitted); *S.H. Deliveries*, 1997 WL 817883, at *2 ("Liquidated damages are a sum to which the parties to a contract have agreed, at the time of entering into the contract, as being payable to satisfy any loss or injury flowing from a breach of their contract. It is, in effect, the parties' best guess of the amount of injury that would be sustained in a contractual breach, a way of rendering certain and definite damages which would otherwise be uncertain or not easily susceptible of proof." (citation omitted)); *see generally Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 2021 WL 1016442, at *9-11 (Del. Super. Ct. Mar. 17, 2021) (summarizing applicable standards).

[87]  *E.g.*, *Donegal Mut. Ins. Co. v. Tri-Plex Sec. Alarm Sys.*, 622 A.2d 1086, 1089 (Del. Super. Ct. 1992); *Lee Builders, Inc. v. Wells*, 103 A.2d 918, 919 (Del. Ch. 1954).

[88]  *W & G Seaford*, 714 F. Supp. at 1347 (citation omitted).

[89]  *Swier*, 900 A.2d at 650 ("The validity of a liquidated damages provision involves a review of the intent of the parties to the contract.").

[90]  *CRS Proppants LLC v. Preferred Resin Holding Co., LLC*, 2016 WL 6094167, at *3 (Del. Super. Ct. Sept. 27, 2016); *Dow Chem. Canada Inc. v. HRD Corp.*, 909 F. Supp. 2d 350, 356 (D. Del. 2012).

contracting.[91]  The second discerns whether the liquidated damages sought are reasonable.[92]  "To fail the second prong . . . the amount at issue must be unconscionable or not rationally related to any measure of damages a party might conceivably sustain."[93]

If the contract-defined liquidated damages are found to be valid, the party enforcing the liquidated damages provision need not establish its actual damages.[94] And contrary to what US Well may think, any liquidated damages Smart Sand is entitled to under the contract need not be offset by any potential value of any retained sand.[95]

---

[91] *Dow Chem. Canada*, 909 F. Supp. 2d at 356; *CRS Proppants*, 2016 WL 6094167, at *3 ("First, are the reasonably-anticipated damages difficult to ascertain at the time of contracting because of indefiniteness or uncertainty?" (citation omitted)).

[92] *Dow Chem. Canada*, 909 F. Supp. 2d at 356; *CRS Proppants*, 2016 WL 6094167, at *3 ("Second, is the amount stipulated either a reasonable estimate of the future damages, or reasonably proportionate to the damages that actually have been caused by the breach?" (citation omitted)).

[93] *Dow Chem. Canada*, 909 F. Supp. 2d at 358 (internal quotation marks and bracket omitted) (quoting *Brazen*, 695 A.2d at 48).

[94] *W & G Seaford*, 714 F. Supp. at 1348-49; *S.H. Deliveries*, 1997 WL 817883, at *2 ("It matters not whether actual damages are proven, or that the liquidated damages are substantially larger than the actual damages, so long as the liquidated damages were a reasonable estimate of the damages which would be caused." (citations omitted)).

[95] *Contra* USW states that any liquidated damages provision that gives a "windfall" to the non-breaching party is void. USW Post-Trial Br. at 19 ("When a purported liquidated damages provision would leave the non-breaching party with a windfall, it is void as penalty.").  To avoid a windfall, USW suggests, the value of the retained product—the unmined sand—must be calculated into the damages equation. *Id.* at 20.  Not so. *See Princess Hotels*, 1997 WL 817853, at *3 ("[T]he duty to mitigate does not arise where liquidated damages exist.").

### a. Reasonably expected damages were difficult to ascertain at the time of the parties' contracting because of indefiniteness or uncertainty.

US Well says that potential damages occasioned by any breach could be reasonably determined at the time the PPA was signed.[96]

Smart Sand disagrees[97] and points to the PPI table in Appendix C, Section 2 of the PPA to show that the quarterly pricing of frac sand was dependent on the price of oil, which itself is volatile.[98] Additionally, because US Well could choose the sand grades and make substitutions, there were more variables to consider, and thus greater uncertainty.[99] According to Smart Sand, oil prices and PPI could never be predicted with requisite certainty.[100]

Smart Sand cites to *CRS Proppants LLC v. Preferred Resin Holding Company LLC*, where this Court found a valid liquidated damages clause, in part, because the damages there were so difficult to ascertain.[101] In *CRS Proppants*, the Court found

---

[96] USW Post-Trial Br. at 27.

[97] SSI Post-Trial Br. at 24 ("[P]otential damages under the PPA were impossible to ascertain at the time of contracting.").

[98] *Id*. at 7, 25.

[99] *Id.* at 27.

[100] SSI Post-Trial Ans. Br. at 25, 27 ("[T]he evidence at trial established that future oil prices, PPI table, product mix, term length, and SSI's future product costs were *all* unknowns at the time of contracting and could dramatically impact actual damages over time." (emphasis in original)).

[101] 2016 WL 6094167, at *3-4 (Del. Super. Ct. Sept. 27, 2016).

that even though there was some explicit pricing in the contract for a certain segment of the contract period, damages were still uncertain;[102] here, Smart Sand argues, the PPA lays out no explicit pricing and is thus more uncertain than that in *CRS Proppants*.[103] Distinguishing *CRS Proppants*, US Well points out that there this Court, in part, found the damages difficult to calculate at the time of contracting after the sophisticated parties' negotiated heavily; and here, in US Well's view, there was no negotiating between the parties.[104]

US Well relies on this Court's earlier decision in *First State Homes, Inc. v. McCann*, to suggest that "only a reasonable estimate or forecast [of anticipatable damages] is required" to find a liquidated damages clause invalid.[105] US Well then suggests that Dr. Becker and Dr. Trexler's testimony that a "reasonable estimation" of damages at the time of contracting was possible.[106]

But US Well, as it must, heavily stresses the wording "reasonable estimate" while largely ignoring the specifics of *McCann* (or other cases) in which that phrase

---

[102] *Id.*

[103] SSI Post-Trial Br. at 28.

[104] USW Post-Trial Br. at 29.

[105] *Id.* at 27-28 (citing *First State Homes, Inc. v. McCann*, 1999 WL 742974, at *2 (Del. Super. Ct. May 28, 1999)).

[106] *Id.* at 34 n.155 ("Becker (SSI) admitted it was possible, in May 2016, to reasonably estimate SSI's damages from a USW PPA breach and Trexler agreed.").

is coined. *McCann* looked at damages flowing from the breach of a general contractor's agreement to finish up six already substantially completed townhomes, something far easier to forecast[107] than the long-term pricing of a specialty product like frac sand[108] that is dependent on myriad domestic and international market factors—including, for one, the seemingly daily fluctuation in oil prices.

The purpose of the four-to-seven-year PPA was to create certainty in what was an emergent and booming frac sand market.[109]   But even with the limited certainty that long-term contract might foster, both parties acknowledged the sundry variables and global pieces that affected the price and utility of this specialty product. In doing so, they created a PPI table that was, in part, reliant on oil prices. As such, the parties mitigated uncertainty as best they could, but the very existence of the PPI

---

[107]   *McCann*, 1999 WL 742974, at *2 (At the time of the contested agreement—that was to last just a few weeks—the construction project was substantially complete and so any damages arising from the builder's subsequent failure to complete the project "were, in the Court's view, damages which were not particularly difficult to estimate or forecast.").

[108]   *See infra* note 109.

[109]   *See generally* MARY ELLEN BENSON & ANNA B. WILSON, U.S. DEP'T OF INTERIOR & U.S. GEOLOGICAL SURV., FRAC SAND IN THE UNITED STATES—A GEOLOGICAL & INDUSTRY OVERVIEW 1, *available at* https://pubs.usgs.gov/pdf/ofr20151107.pdf (last visited May 28, 2021) (observing that a "new mineral rush [wa]s underway" in 2015 "for deposits of high-quality frac sand . . . a specialized type of sand . . . injected into unconventional oil and gas wells during hydraulic fracturing (fracking or hydrofracking) . . . [to] enhance[] petroleum extraction from tight (low permeability) reservoirs" and noting that "[f]rac sand consists of natural sand grains with strict mineralogical and textural specifications that act as a proppant" and "is a high-purity quartz sand with very durable and very round grains.").

table shows the uncertainty inherent in this specific industry and contract.[110]

### b. The damages required by PPA Section 1.5(c) are reasonable.

When addressing the second consideration—reasonableness—that informs whether a contracted-for sum is a penalty or allowable liquidated damages, the Court evaluates whether the subject damages are (i) unconscionable, or (ii) not rationally related to a measure of damages.[111]

#### i. The Cumulative Shortfall Payment isn't unconscionable.

Both Smart Sand and US Well agree that the language of Section 1.5(c) is unambiguous.[112] Each, however, urges a different interpretation of that same language. Not unusual. And the Court need not suspect that contract language might indeed be ambiguous merely because the parties dispute what it means.[113]

US Well suggests that "the only reasonable interpretation of [Section 1.5(c)]

---

[110] *See Dow Chem. Canada*, 909 F. Supp. 2d at 357 ("It is hard to understand how damages for the termination of a complex collaborative engineering project could be estimated with certainty years before the details of the project itself were finalized.").

[111] *Brazen*, 695 A.2d at 48 ("[T]o fail the second prong . . . the amount at issue must be unconscionable or not rationally related to any measure of damages a party might conceivably sustain.")

[112] USW Post-Trial Br. at 21 ("Everyone agrees Section 1.5(c) is unambiguous. . . ."); SSI Post-Trial Ans. Br. at 23.

[113] *E.g.*, *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *8 (Del. Ch. Apr. 7, 2015) ("That the parties dispute how to interpret a term does not render the contract ambiguous."). Indeed, ambiguity exists *only* when disputed provisions are "fairly or reasonably susceptible to more than one meaning." *Alta Berkeley IV C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citations omitted).

is that the PPA obligates USW to pay all Prior Unpaid Invoices ***and*** the Final invoice."[114]  The main thrust of US Well's argument is that the PPA includes no express wording that would allow reduction of the CSP by sums included in previous unpaid invoices.[115]  Thus, to US Well, the only way to read the PPA is that the unpaid invoices and the CSP are both separately due—totaling approximately $105 million[116]—something both parties seem to agree is unreasonable.

Smart Sand argues that while not defined in the PPA, the ordinary meaning of "cumulative" is such that the CSP would accumulate unpaid invoices for required sand purchases into a single sum, not add some additional cumulative sum to those previously unpaid invoices.[117]  Too, says Smart Sand, because the "cumulative" nature of the CSP incorporates the unpaid invoices for all shortfall-related obligations, it follows that the "*paid* invoices for shortfall-related obligations are expressly deducted by the CSP."[118]

---

[114]  USW Post-Trial Br. at 21 (emphasis in original).

[115]  *Id.*

[116]  *Id.*

[117]  SSI Post-Trial Ans. Br. at 17-18 (internal quotation marks omitted) (quoting *Cumulative*, BLACK'S LAW DICTIONARY (11th ed. 2019)) ("When an amount is cumulative, that means it is including all amounts previously added. . . . [F]or that reason, the CSP does precisely as its name requires: it includes all the amounts set forth in prior unpaid invoices and combines them into the CSP.").

[118]  SSI Post-Trial Ans. Br. at 16 (emphasis in original).

Section 1.5(c) provides an example of how the Cumulative Shortfall Payment might be applied:

> (i) Cumulative Net Tons = 2,000,000 - (Cumulative Purchased Tons + tons of Replacement Products), and (ii) Cumulative Shortfall Payment = (Cumulative Net Tons * $40) - prior True Up Payments - Unused Reservation Charge for the final Contract Year of the Term. If the Cumulative Net Tons is equal to or less than 0, then the Cumulative Shortfall Payment shall be $0.

Read Smart Sand's way, the Section 1.5(c) damages aren't unconscionable; given US Well's read—with double-billing for reserved tons that were both untaken and unpaid-for—the Section 1.5(c) damages are.

Under Delaware law, "[t]he proper construction of any contract is purely a question of law."[119] "The objective [of interpretation] is to give full effect to the parties' mutual intent at the time of contracting."[120] In respecting that mutual intent, the Court "read[s] a contract as a whole and . . . give[s] each provision and term [purpose], so as not to render any part of the contract" superfluous.[121] And "[w]hen the contract is clear and unambiguous," the Court "give[s] full effect to the

---

[119] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266-67 (Del. 2017) (internal quotation marks and ellipses omitted).

[120] *Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *5 (Del. Super. Ct. Apr. 26, 2019) (second citation omitted) (citing *Exelon*, 176 A.3d at 1263); *accord Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014).

[121] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (citation omitted).

-26-

plain-meaning of the contract's . . . provisions."[122]  "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."[123]  As between two alternative interpretations—one reasonable, one absurd—the Court is bound to follow the former.[124]

Of course, there is good reason for US Well to now press its extreme reading of Section 1.5(c) with duplicate counting of shortfalls and a resulting nine-figure damage total—the Court might be far more likely to find that unconscionable and just relieve US Well of any shortfall obligation.  But it is simply beyond belief that that these sophisticated parties would consent to such a severe consequence.

The Court finds that the Cumulative Shortfall Payment is unambiguous:  it constitutes the accrued shortfall payments due during the life of the contract.  So it is not unconscionable.

### ii. The damages are rationally related to a measure of damages.

US Well's main contention here is that the parties never tried to "estimate SSI's damages from a USW Breach[,]" and that the $40/ton figure wasn't resultant

---

[122] *Hallisey v. Artic Intermediate, LLC*, 2020 WL 6438990, at *3 (Del. Ch. Oct. 29, 2020) (internal quotation marks and citation omitted).

[123] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (citations omitted).

[124] *E.g.*, *Capella Holdings, LLC v. Anderson*, 2017 WL 5900077, at *5 (Del. Ch. Nov. 29, 2017) (citing *Osborn ex rel. Osborn*, 991 A.2d at 1160)).

of informed negotiations between the parties.[125]

The credible evidence is that US Well's then-CEO Brian Stewart offered the $40/ton shortfall payment in a November 2015 email during negotiations aimed at amending the parties' Master Product Purchase Agreement, and that Smart Sand eventually accepted it.[126] The fact that Smart Sand did not counter that shortfall payment offer, "did not consider whether the amount was enforceable[,]" and reportedly "never rejected a proposed [ ] make-whole fee as too high" is of little moment.[127] At bottom, US Well made an offer, Smart Sand accepted that offer, and consideration to both parties supported their respective obligations thereunder.

Mr. Stewart did tell the Court that "he was simply trying to lower US Well's exposure from full purchase price to some less number, and he had no insight into Smart Sand's internal costs and never performed any analysis of what Smart Sand's actual damages might be in the event of breach."[128] But according to Mr. Stewart's own email, he knew the $40/ton shortfall rate would appease his Board.[129] And whatever his reason for landing on that figure, Mr. Stewart's *post hoc* claim of

---

[125] USW Post-Trial Br. at 30.

[126] USW Post-Trial Ans. Br. at 14.

[127] *Id.*

[128] *Id.* at 32.

[129] JX-50.

ignorance after the price of sand dropped adds nothing to US Well's claim.

US Well points to contemporaneous contracts (Weatherford, ██/ton; Rice, ██/ton; Liberty, ██/ton), to suggest that the $40/ton number was irrationally high.[130] US Well says that "variability alone (with zero explanation from SSI) shows $40-per-ton is unreasonable."[131] But again, Mr. Stewart proposed it—a number that, if nothing else, appeased US Well's board—and Smart Sand accepted it.

One final point, that $40/ton shortfall price was almost smack in the middle of the pricing grid the parties used for sand products under the PPA.[132]

All in all, the estimate of damages at the time of contracting could be seen to derive from a number of reliable sources: (1) Purchaser US Well's own assessment of worth as evidenced by the fact that value was first proposed by its then-CEO; (2) the fact that it represented a cost below the approximately $45/ton price for delivered sand that was being invoiced to US Well when the amended PPA was executed;[133] and (3) the fact that $40 falls roughly in the mid-range of all potential per-ton pricing applicable to the May 2016 agreement.[134] Hence, the $40 charge per

---

[130] USW Post-Trial Br. at 33.

[131] *Id.*

[132] *See* Trial Tr., Dec. 14, 2020, at 97-99 (Mr. Beckleman explaining the PPA's pricing grid); *id.* at 99 ("So, again, it could be at 25 to 30 on the low end and again on high end depending on the product, you get up to $66 a ton.").

[133] Trial Tr., Dec. 15, 2020, at 105.

shortfall ton bears a rational relationship to a measure of damages the parties could have estimated Smart Sand might conceivably sustain if US Well did not follow through with its sand purchase obligations.

### B. US WELL IS LIABLE FOR THE DAMAGES BARGAINED-FOR AND REQUIRED UNDER PPA SECTION 1.5.

No doubt, US Well came to regret its agreement to certain PPA pricing terms. But the Court "will not disturb a bargain because, in retrospect, it appears to have been a poor one."[135] "Parties have a right to enter into good and bad contracts, the law enforces both."[136] And when it comes to liquidated damages, there is a summer's afternoon of daylight between bad and unconscionable.

In determining whether Section 1.5 of the PPA constitutes a valid liquidated damages provision, the Court has considered whether potential damages were uncertain at the time of contracting, and whether the liquidated damages were rationally related to any reasonable measure of damages or were unconscionable. Having found that the fluctuating price of sand made damages uncertain to determine at the time of contracting, and that the liquidated damages reflect a

---

[134] *See* Trial Tr., Dec. 14, 2020, at 97-99.

[135] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) (citation omitted), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009).

[136] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *Murdoch*, 2015 WL 1593745, at *9 ("Parties to contracts governed by Delaware law are free to make bad bargains. . . ." (internal quotation marks and citations omitted)).

US Well-recommended sum that is rationally related to a measure of damages and not unconscionable, the Court finds that Section 1.5 of the PPA is a valid liquidated damages provision.

As such, US Well is liable to Smart Sand for the cost of the 1,206,795 tons of frac sand US Well did not purchase and take from Smart Sand under the PPA.[137]

## C. SMART SAND IS NOT ENTITLED TO DAMAGES BASED ON US WELL'S BREACH OF THE RUA.

Both Smart Sand and US Well have spent little time discussing the RUA. In the meager effort devoted to it, Smart Sand claims that, because of US Well's breach, the total amount of the contract ($5.8 Million) is due.[138] Specifically, Smart Sand states that the damages should reflect the 'expected' payment to Smart Sand had the contract been fulfilled.[139]

In Delaware, when awarding expectation damages, lost profits must be calculated with reasonable certainty.[140] And a Delaware court "may not set damages based on mere speculation or conjecture where a plaintiff fails adequately to prove damages."[141]

---

[137] The Court finds that Dr. Becker's calculations accurately reflect the sums of purchased and retained sand. *See* Trial Tr., Dec. 16, 2020, at 193 (Stephen Becker).

[138] SSI Post-Trial Br. at 36-37 (setting forth Smart Sand's single paragraph RUA argument).

[139] SSI Post-Trial Ans. Br. at 35.

[140] *E.g.*, *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1138 (Del. 2015).

So, has Smart Sand properly proven damages suffered under the RUA? In its post-trial brief, Smart Sand dedicates just a few lines to the issue and simply says that "USW stopped paying its bills as of September 1, 2018 and therefore breached the RUA. USW is liable to SSI for $5,850,000 for monthly Railcar Payments of $292,500 for the 20 months between September 2018 and April 2020."[142] There was scant testimony on the RUA and no explanation of its implementation or actual execution during the Smart Sand-US Well business relationship. And nowhere does Smart Sand provide a comprehensible explanation of how its calculation matches any actual or expectation losses caused by the breach it alleges.

Not surprisingly, US Well contends that Smart Sand has not proven either a breach or damages due under the RUA, and so Smart Sand is entitled no damage award on this claim.[143] The Court agrees.

At the very least, Smart Sand's failure to prove damages resulting from the alleged RUA breach is fatal to its claim, and thus Smart Sand is not entitled to monetary damages on this claim.[144]

---

[141] *eCom. Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *42 (Del. Ch. Sept. 30, 2013) (internal quotation marks and citations omitted).

[142] SSI Post-Trial Br. at 36-37 (internal citations omitted).

[143] USW Post-Trial Br. at 39-40.

[144] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) ("Nevertheless, when acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." (first quoting *Medek v. Medek*, 2009 WL 2005365, at

**D. SMART SAND IS ENTITLED TO PREJUDGMENT INTEREST, BUT NOT ATTORNEY'S FEES.**

Smart Sand asks for attorneys' fees and prejudgment interest citing Section 2 of the PPA.[145] But Smart Sand fails to identify the specific PPA language requiring the payment of either attorneys' fees or prejudgment interest. US Well opposes Smart Sand's demand contending that Smart Sand has neither cited the contractual language nor offered support for awarding those fees and interest.[146]

As Smart Sand points to no specific PPA language calling for an award of attorneys' fees, the Court will not deviate from the American rule.[147] Concerning prejudgment interest, a non-breaching party is entitled to prejudgment interest as a matter of right, and that balance will not be disturbed.[148]

---

[145] SSI Post-Trial Br. at 40 n.173.

\*12 n.78 (Del. Ch. July 1, 2009); then citing *Henne v. Balick*, 146 A.2d 369, 396 (Del. 1958))).

[145] SSI Post-Trial Br. at 40 n.173.

[146] USW Post-Trial Br. at 38.

[147] *E.g.*, *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007); *see Sternberg v. Nanticoke Mem'l Hosp., Inc.*, 62 A.3d 1212, 1218 (Del. 2013) ("It has been long practice of American courts to enforce the so-called 'American Rule'—which requires each party to pay his or her own legal costs, even the prevailing party." (citations omitted)); *see also Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2018 WL 300454, at \*2 (Del. Ch. Jan. 5, 2018) (noting the Court of Chancery has applied the "predominance in the litigation" standard to prevailing-party contract provisions; that "[t]o achieve predominance, a litigant should prevail on the case's chief issue"; and, that there are occasions where "no party may be regarded as having prevailed." (internal quotation marks and citations omitted)).

[148] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) ("[I]n addition to the principle that prejudgment interest in Delaware cases is awarded as a matter of right, the general rule is that interest accumulates from the date payment was due the plaintiff, because full compensation requires an allowance for the detention of the compensation awarded

Thus, the Court awards Smart Sand prejudgment interest on Count IV (breach of the PPA), and both parties will pay their own attorneys' fees.

## V. CONCLUSION

While this judgment results in a substantial payment to Smart Sand, that is what the parties bargained for via the PPA. In the best of times, the deal could have resulted in a substantial profit for US Well as it used the product for its customers energy ventures. But the worst of times came, resulting in a substantial downturn in sand prices, and now, US Well's substantial loss under the PPA. These were sophisticated (and represented) parties that realized the risks associated with such a purchase contract, yet still pursued it. The Court can't now rescue one of those parties from the deal it penned when it foresaw significant gain simply because its hopes evaporated due to world and market forces.

---

and interest is used as a basis for measuring that allowance." (internal quotation marks and citation omitted)).

## VERDICT AND JUDGMENT

- Count IV (Breach of Contract for Non-Payment of the Final Invoice): For Smart Sand

- Count V (Breach of Contract for Non-Payment of the RUA Invoice): For US Well

Additionally, Smart Sand is entitled to prejudgment interest on Count IV, but is not entitled to Attorneys' Fees.

The parties shall confer and, within 15 days, submit to the Court a proposed form of Order of Final Judgment consistent with these findings and verdicts.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

Original to Prothonotary
cc: All counsel via File & Serve